SCHROETKE *v.* JACKSON-CHURCH CO.

1. MASTER AND SERVANT—ACCIDENT—PERIL—DEFINITION.
   The words peril or accident denote an unexpected occurrence or mishap, taking place without design.

2. SAME—COMPENSATION—NERVE SHOCK.
   One who suffers from some shock, or nervous condition, as a result of an untoward incident, or disturbing event, arising in connection with or out of his employment, may recover compensation from the master.

3. SAME—ACCIDENT—NERVE SHOCK.
   A watchman, who received a nervous shock from the breaking out of a fire on his employer's premises, resulting in heart failure and death, was within the compensation act and his wife could recover as for an accident; and an order denying the award is reversed and the cause remanded to the accident board.[1]

Certiorari to Industrial Accident Board. Submitted October 16, 1916. (Docket No. 146.) Decided December 21, 1916.

Fredericka Schroetke presented her claim against the Jackson-Church Company for compensation for the death of her husband in defendant's employ. From an order denying compensation, petitioner brings certiorari. Reversed and remanded.

*R. L. Crane,* for appellant.
*Keena, Lightner, Oxtoby & Hanley,* for appellee.

STONE, C. J. This is certiorari by claimant to review the decision of the Industrial Accident Board. Frederick Schroetke died while in the employment of the respondent, on June 13, 1913. Respondent was

[1] As to application and effect of workmen's compensation acts, generally, see comprehensive note in L. R. A. 1916A, 23.

under the workmen's compensation law (2 Comp. Laws 1915, § 5423 *et seq.*). The claimant is the widow of deceased. The deceased was about 72 years of age. He had been for 15 years continuously in the employ of the respondent as night watchman at its foundry and shops in Saginaw, and among his other duties he was to watch for accidental fires in said foundry and shops during the night, and, in the event of one breaking out, to extinguish it, if possible, and spread an alarm for aid to extinguish and control it. On the date in question deceased had spent the day at home, about eight blocks from respondent's plant, and about 5 o'clock in the afternoon left his home in usual health to take up his work at 6 o'clock in the evening. He walked to the foundry. A few minutes after beginning his work at said foundry and shops a fire broke out, and deceased attempted to extinguish it, and spread an alarm thereof, and as a result of his efforts to give the alarm of the fire and attendant excitement he died of heart failure, the death being hastened and caused, in whole or in part, thereby. He died in said foundry immediately after the arrival of the fire department. Compensation was denied by the committee of arbitration and this decision was affirmed by the full board.

The testimony taken before the committee of arbitration is all contained in the record, and it may be said that the evidence is undisputed. Immediately after the death of Mr. Schroetke, and while the body was still lying in the building, Dr. W. F. Morse was called to the plant and examined the body. He testified that he saw no signs of external marks upon the body, and that from the examination he was of the opinion that Mr. Schroetke died from heart trouble; that the witness had treated the deceased some three or four years before; that at that time deceased was suffering from stomach trouble, and he had an irregu-

lar heart action; that he might have died from *angina pectoris;* that he did not disclose to Mr. Schroetke the condition of his heart when he treated him. The following testimony was given in answer to questions of the committee:

"*Q.* In case a man has a weak heart, would excitement and overexertion have a tendency to precipitate stoppage of the heart and death?

"*A.* I would say it would.

"*Q.* So if this man Schroetke had a weak heart, heart trouble, and was engaged as watchman in the plant of the Jackson-Church Company and discovered a fire, and exerted himself somewhat in giving the alarm, what would you say as to the probable effect of the excitement and overexertion?

"*A.* Why any undue and overexcitement might affect the heart.

"*Q.* What would you say as to the exertion?

"*A.* Of course, that aided.

"*Q.* The quick movements the man probably would make in a case fire breaking out?

"*A.* I think the action through the excitement and the shock would cause the heart, possibly, to cease to beat.

"*Respondent's Counsel: Q.* Ordinarily speaking of a man who was suffering from heart trouble, or any other condition such as to give any such effect, that almost anything might cause his death?

"*A.* I would say that any little shock or excitement might bring it on.

"*Q.* In other words, if I understand you correctly, the condition of his heart had been running such a length of time that almost anything which would be a shock or some undue excitement would cause his sudden demise?

"*A.* Yes.

"*A Member of the Committee: Q.* You don't want to say any little thing would affect his heart?

"*A.* I think any shock, excitement of any kind, would bring on the same condition of things; any excitement would bring on heart failure.

"*Q.* That is, if the heart was in a certain condition?

"*A.* Yes; if the heart was a weak heart.

"*Q.* Is there anything else, Doctor, that might have caused his death excepting heart failure and heart trouble?

"*A.* I think he died from heart trouble."

Error is assigned on the action of the board in refusing to award compensation to claimant, when, as is claimed, the testimony and conceded facts show there was an accidental, personal injury to deceased resulting in death.

The answer of the Industrial Accident Board to the writ of certiorari, in referring to the hearing before that board, contains the following language:

"At the inception of the hearing claimant's attorney stated:

"'As I understand, the facts in this case are not in dispute. The position of the defendant is no liability, because the death resulted from heart failure while deceased was in the performance of his duty as watchman for respondent. The cause of death arose from and grew out of the discharge of the employee's duties to defendant, and death resulted from an affected heart and overexertion and excitement in the discharge of his duty. If these are not the facts, and respondent takes different position, I desire to produce further testimony in the cause.'

"*Mr. Kinnane:* I so understand the facts. We certify and return that deceased was employed as watchman in respondent's plant at Saginaw at the time of death and for 15 years just prior. Among his duties he was required to watch for fires in the plant, and in event of one breaking out to extinguish it and spread alarm for aid. He began his labors about 5:30 p. m., and continued till 6 a. m., each night. He spent the day prior to his death with his family apparently enjoying good health and went to his work eight blocks from home at 5 p. m. He discovered a fire at 6 p. m. in defendant's plant, and immediately spread alarm by blowing the whistle. The president of the company went from the office near by into the plant and told him not to blow the whistle longer, as he would telephone the fire department. In a few minutes deceased began sounding the whistle again, and

the president went to him and said, 'I have phoned the fire department, and don't blow the whistle any more, but close the factory doors and keep the crowd out.' A strike was on at the factory. Directly the fire department arrived and proceeded to place the hose to extinguish the fire. Deceased said something to one of the firemen concerning directing the stream on another part of building. The president of the company observed deceased was pale and started to fall. His knees began to waver. In a few minutes he dropped to his knees, fell over, and died almost instantly. Dr. Morse, the physician who had previously treated the deceased, was called and examined the body, and gave testimony at the hearing as to the condition found and his opinion as to the cause of death, said testimony being correctly set forth in the petition in this case.

"The plant of the defendant is a large one covering the block, and the deceased was the only watchman. The deceased showed much zeal in giving the alarm of fire and to protect his employer's property, and was excited. He was afflicted with heart ailment, and his death was due to heart failure caused by the diseased condition of his heart and the excitement and exertion incident to the fire. He received no physical injury in the sense that he was not struck by anything, did not fall, or receive any blow, contusion or physical impact.

"(2) The proceedings at the hearing before the committee on arbitration and the evidence in said cause are correctly set forth in the petition attached to and made a part of this return, except that the following should be added: 'The fire was a small one, and was in a shed adjoining one of the factory buildings. The total loss was about $600 principally arising out of injury to the motors belonging to the company.'

"(3) The arbitrators' found claimant was not entitled to compensation under Act No. 10, Extra Session 1912 (2 Comp. Laws 1915, § 5423 et seq.). Claimant duly appealed to this board, but upon its suggestion the appeal rested until a similar case then before the board should be disposed of, but, that case not coming to decision, the instant case was in proper time and manner presented for decision. This board on April

20, 1916, presented that under the facts the law as provided in said Act No. 10 of 1912 did not permit claimant to recover, and the decision of the arbitrators was affirmed.

### "Conclusion of Law.

"The holding of the board as a matter of law in this case was that the excitement and exertion, unaccompanied by any immediate physical injury, did not constitute an accident for which compensation could be awarded, within the meaning of the Michigan workmen's compensation law."

The evidence in the case being undisputed, we think the record fairly raises the question whether the conclusion of law reached by the Industrial Accident Board was justified by the facts found. We think this case fairly presents the question whether compensation can be recovered where death or disability results from overexertion and excitement caused by an accidental fire such as broke out in this case, where the deceased was afflicted with heart ailment, and where death was due to heart failure caused by deceased's condition of the heart and the excitement and exertion incident to the fire. It is the claim of the claimant that the case is governed and controlled by our own decisions, and especially by *La Veck* v. *Parke, Davis & Co.,* 190 Mich. 604 (157 N. W. 72 L. R. A. 1916D, 1277).

In our opinion the instant case is a stronger case in favor of awarding compensation than the *La Veck Case.* In the instant case, by the undisputed evidence, the exertion and excitement occasioned by this accidental fire produced a nervous shock and increased the heart action of the deceased and caused his death. May this be said to have been an accidental death within the meaning of our act? This portion of our act was borrowed from the English act, and it early became necessary to determine what was personal in-

jury or death by accident, and to give a definition of the word "accident" in the English courts.

In *Hensey* v. *White* (1900), 1 Q. B. Div. 481, the language of an earlier case was approved, where it was said:

"I think the idea of something fortuitous and unexpected is involved in both words 'peril' or 'accident.' "

In *Fenton* v. *Thorley & Co.*, 72 L. J. K. B. Div. (N. S.) 790, it was said:

"The expression 'accident' is used in the popular and ordinary sense of the word as denoting an unlooked for mishap, or an untoward event which is not expected or designed."

In the case of *Yates* v. *South Kirby, etc., Collieries, Ltd.*, in the court of appeal, England, reported in 3 B. W. C. C. at page 418, Yates, a collier, assisted to remove a fellow workman who had been knocked down and so shockingly injured by a fall of coal that he died almost immediately. This gave Yates such a nervous shock that he became neurasthenic, and, although he made some attempts to resume work, he was unable to do so. On an application for compensation the judge found that his incapacity was genuine, and that it was caused by what he had seen and done in the course of his employment. On these findings he held that the neurasthenia was due to personal injury by accident, and awarded compensation. This decision was held to be right. The trial judge in that case found as follows:

"The applicant picked him (Haggas) up in his arms, and with assistance carried him away. He was not dead at the time, but died in a quarter of an hour. The effect on the applicant was such that he sustained a nervous shock which incapacitated him from working at the coal face. * * * I find as a fact that there was a genuine incapacity to work which was due to the nervous shock which he sustained on the

9th October.  It clearly was his duty to his employers to go to the assistance of the injured collier who shouted for help from the next working place, and his doing so arose both in the course of and out of his employment."

He found the cause of injury was nervous shock, and that that was a case within the act.  The appellate court judge in disposing of the case, said:

"In my opinion on that finding of fact, it is impossible for us to say that the learned county court judge was wrong in law.  * * *  I think the decisions of this court, including the recent decision in the case of *Eaves* v. *Blaenclydach Colliery Co.*, 2 B. W. C. C. 329, do show that when a man in the course of his employment goes to a place and sustains a nervous shock producing physiological injury, not a mere transient emotional impulse, it is an accident arising out of and in the course of his employment.  It is something unexpected, no doubt, in this sense, that I do not suppose the man thought for a moment, or knew when he was doing what was plainly his duty in going to the rescue of the other party, that it would have this physiological effect on his system.  * * *  I think this is a case which falls within the act of Parliament on the same principle and in the same way as if the man on going to the rescue of the other collier was injured by this fall or had stumbled or fallen on his way there.  That, undoubtedly, would have been a case within the act, and I can see no real difference in principle (when once you get rid of malingering) between that case and a case where a physiological injury—physiological damage—is produced by reason of what happened to this man when he went in the course of his duty to the neighboring stall, and saw what had happened to this workman.  In my opinion, the learned county court judge was right."

In *Clover, Clayton & Co.* v. *Hughes*, 3 B. W. C. C. 275, a workman suffering from an advanced aneurism of the aorta was doing his work in the ordinary way by tightening a nut with a spanner.  This ordinary strain caused a rupture of the aneurism, resulting in

death. The county court judge, on conflicting evidence, found that the workman's death resulted from a personal injury by accident within the meaning of the English act. In the House of Lords it was held that there was evidence on which the county court judge was justified in so deciding. In the discussion of that case Lord Macnaghten said:

"In the argument in *Fenton* v. *Thorley, supra,* many decided cases were cited in which the word 'accident' was considered. There is one which was cited in the argument and not noticed in the judgment, which is, I think, a very good example of the far-reaching application of the word. I may perhaps be permitted to refer to it. It is not the less instructive because it occurred before the workmen's compensation act of 1897. The case was this: The railway company had established a system of insurance for the benefit of their servants who contributed to it. One of their servants—a signalman in his signal box—saw a train coming, and noticed that there was something wrong with one of the carriages. He was much alarmed, and waved his flag frantically. The engine driver saw the signal, the train was stopped, and an imminent disaster was averted. But the signalman was so horrified that he lost his nerve and was incapacitated for work. Was that an accident? The condition of the insurance was 'against all accidents, however caused, occurring to the insured in the fair and ordinary discharge of his duty.' The court of appeal, consisting of Lord Esher and Kay and A. L. Smith, LL. J., held unanimously that the plaintiff had been incapacitated by accident within the meaning of the policy. 'The sole question,' said A. L. Smith, L. J., 'is whether the facts which have been proved constitute an injury to the assured by an accident within the meaning of the policy. * * * This is not a case in which, as it has been suggested, the plaintiff has only suffered mental pain or grief. If that had been so, it would not have been within the policy; but this is a case in which he has been subjected to such a shock to his nerves that he has become physically prostrated and put out of employment for months. The company has under-

taken to pay to the assured the weekly allowance of one pound in case of his being incapacitated for employment by reason of an accident, however caused. That I read to mean any unforeseen circumstance, however caused, occurring to him in the discharge of his duty in the company's service.  *  *  *  It may be that this sort of accident was not thought of when the policy was framed, for it is of rare occurrence, but that does not prevent its coming within the terms of the policy.' *Pugh* v. *Railway Co.* (1896), 2 Q. B. Div. 248. Now, in the present case, I have no doubt that there was an accident in the proper sense of the word. The man ruptured an aneurism in his aorta. An aneurism, as I understand, is an unnatural or abnormal dilation of an artery; but still it is a part of the artery, and so a part of the man's body. The man 'broke part of his body,' to borrow Lord Robertson's expression in *Brintons* v. *Turvey*, 7 W. C. C. 1."

In the instant case the whole circumstance, including the fire, the overexertion and the excitement of the deceased, may be said to have been an accident. It was certainly a fortuitous circumstance. The fact that the man's condition predisposed him to such an accident or stroke must be, under the authorities, held to be immaterial. While the exertion and excitement which accelerated the heart action were not the sole, proximate cause of the death, they were certainly concurring causes. *Rayner* v. *Furniture Co.*, 180 Mich. 168 (146 N. W. 665, L. R. A. 1916A, 22, Am. & Eng. Ann. Cas. 1916A, 386.

Counsel for claimant have cited two Massachusetts cases, *McNicol's Case*, 215 Mass. 497 (102 N. E. 697, L. R. A. 1916A, 306), and *Brightman's Case*, 220 Mass. 17 (107 N. E. 527, L. R. A. 1916A, 321). In the last-cited case it was held that acceleration of previously existing heart disease to the mortal end sooner than otherwise it would have come is an injury within the

meaning of the workmen's compensation act. We do not cite these cases as authorities under our compensation act.

In *Adams* v. *Color Works*, 182 Mich. 157, at pages 168, 169, and 170 (148 N. W. 485, L. R. A. 1916A, 283, Am. & Eng. Ann. Cas. 1916D, 689), we pointed out the distinction between the Massachusetts act and the Michigan act. This distinction is recognized by the Massachusetts court in *Re Madden*, 222 Mass. 487 (111 N. E. 379, L. R. A. 1916D, 1000), where the court says:

"The standard established in this respect by our workmen's compensation act as the ground for compensation is simply the receiving of 'personal injury arising out of and in the course of' the employment. This standard is materially different from that of the English act and of the acts of some of the States of this nation. That standard is 'personal injury by accident,' both in the act of 1897 and 1906."

A perusal of this case will show the distinction we have suggested. We think, however, that under the English cases, and under *La Veck* v. *Parke, Davis & Co.*, *supra*, it must be held that the death of claimant's decedent, under the circumstances disclosed by the undisputed evidence, entitled claimant to compensation, and that the conclusion of law reached by the Industrial Accident Board was erroneous.

In *Bryant* v. *Fissell*, 84 N. J. Law, 72 (86 Atl. 458), it was held that the question whether or not an injury is an "accident" within the purview of the New Jersey act is a mixed question of law and fact, and that when applied to certain facts it is a question of law.

On the part of the respondent it is contended that in the instant case claimant's intestate did not suffer any injury, and therefore that no injury caused his death, that it would be more correct to say that death occurred during the hours of service, and that under

the authorities in this State there is no liability shown, and *Nelson* v. *Crawford*, 122 Mich. 466 (81 N. W. 335, 80 Am. St. Rep. 577), is cited. We do not think that this case is applicable to a claim under this act.

We have examined the cases cited by respondent's counsel in which no liability was held. They are the following:

*O'Hara* v. *Hayes*, 3 B. W. C. C. 586. In that case a workman who had been suffering for some years from progressive heart disease died while hurrying to the railway station with a parcel weighing 17 pounds, and it was held that the death was attributable to the disease and not to an accident. The appellate court in that case said:

"This man died while he was doing his normal work. There was nothing sudden. His death was not unexpected."

The next case cited is that of *Kerr* v. *Ritchies*, 6 B. W. C. C. 419. There a workman, apparently in good health, died suddenly from heart failure while at work lifting baskets filled with corn. The sheriff-substitute found:

"That nothing unusual or unexpected occurred in the course of his work that afternoon, until the sudden attack of illness, and that the strain arising from the exertion made by the deceased in repeatedly lifting the baskets was a contributing cause of the heart failure."

He found that death was due to accident. The appellate court reversed this decision, and held that nowhere was there found any particular event or occurrence to which death could be attributed, and it was held that there was no liability.

The next case cited is that of *Black* v. *Shipping Co.*, 6 B. W. C. C. 720. In that case an officer was superintending loading a ship for several days. The work

was practically continuous day and night and very hard. Six days after the ship left port the officer died of heart failure. There was medical evidence that the death was due to heart failure caused by the continuous strain of work. The county court judge found that there was no evidence of accident and the appellate court affirmed that action, holding that there was no evidence of accident within the meaning of the act.

We think that these three cases are all readily distinguished from the instant case. Our conclusion is that the finding of the Industrial Accident Board in its conclusion of law was erroneous, and must be reversed.

Under the practice, as stated in *Andrejwski* v. *Coal Co.*, 182 Mich. 298 (148 N. W. 684, Am. & Eng. Ann. Cas. 1916D, 724), and *Finn* v. *Railway*, 190 Mich. 112 (155 N. W. 721, L. R. A. 1916C, 1142), and *Carpenter* v. *Forging Co.*, 191 Mich. 45 (157 N. W. 374), the order of the State Industrial Accident Board is reversed, and the case remanded for further proceedings in accordance with this opinion.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., did not sit.