## ROSALIE MCDONOUGH v. CONNECTICUT BANK AND TRUST COMPANY ET AL.
### (12972)

PETERS, C. J., SANTANIELLO, HULL, HIGGINS and F. HENNESSY, Js.

Argued March 4—decision released June 16, 1987

*Robert E. Beach, Jr.,* for the appellants-appellees (defendants).

*Matthew Schafner,* with whom was *Frank N. Eppinger,* for the appellee-appellant (plaintiff).

HULL, J. The plaintiff employee, Rosalie McDonough, claimed workers' compensation benefits from her employer, the defendant Connecticut Bank and Trust

Company, as a result of unusual emotional stress at work which accelerated underlying physical conditions and precipitated the onset of disabling heart disease. On December 7, 1982, the workers' compensation commission for the second district awarded her statutory compensation for total incapacity, for the period from June 19, 1980, until July 15, 1981, and reasonable medical expenses.[1] The named defendant and the defend-

[1] The relevant portions of the award of compensation are as follows:

"On and before June 18, 1980, the claimant was an employee of the respondent employer which had secured its obligations under the Workers' Compensation Act by insuring its liability thereunder with the respondent insurer.

"Claimant had been employed by the respondent employer for 21 years, the last 3 of which she spent as the supervisor of the Discount Department at the respondent's Groton branch.

"At the time of the hearing, claimant was 58 years old and had a family history of cardiovascular problems. . . .

"From the testimony of the claimant and a subordinate, Stella Bergeson, it appears that problems developed in the Discount Department which culminated in the calling of a meeting by the claimant's superior, Mr. Coulthard, on June 16, 1980.

"There are conflicting accounts of what occurred at the meeting; however, it is clear that some form of criticism was directed at the claimant. The events of the meeting raised enough emotion in the claimant to force her to leave the meeting in tears.

"On June 18, 1980, while at work, the claimant received a memorandum detailing the events of the meeting with which she did not agree. She became upset and felt a pain in her chest.

"This event was followed by another meeting in which she felt she was unjustly criticized and left for home.

"When she arrived at her house, the chest pain became worse, and she went to the emergency room of the Lawrence and Memorial Hospital, New London, Connecticut, where she was admitted.

"After an apparently normal EKG test, the claimant was discharged on June 23, 1980, with a diagnosis by Dr. Richard Barry of thoracic outlet syndrome and urinary tract infection. . . .

"The claimant did not return to work, although the employer called her on several occasions to determine her work status.

"She continued to experience chest pains. On July 3, 1980, she sought out treatment with a cardiologist, Dr. Richard Pembrook, of New London, Connecticut.

"Because of the number of risk factors, such as family history of heart disease, extensive cigarette smoking and obesity, Dr. Pembrook suspected

ant Travelers Insurance Company, its insurer, appealed the award to the compensation review division (CRD). The plaintiff then cross appealed to the CRD.

that the cause of her chest pains was cardiovascular rather than musculoskeletal, as had been diagnosed by Dr. Barry. . . .

"Dr. Pembrook then performed a vectorcardiogram, which indicated myocardial ischemia. . . .

"On July 17, 1980, the doctor performed a stress electrocardiogram and became further convinced of an underlying cardiovascular disease involving not only fixed obstruction of the coronary arteries, but intermittent spasm, and that the chest pain she was experiencing was angina pectoris.

"He then ordered a coronary arteriogram for the claimant which was performed at St. Francis Hospital in Hartford, Connecticut, which revealed that the right coronary artery was totally occluded, the left anterior descending coronary artery was 70 percent occluded, and the circumflex coronary artery was 40 percent occluded. . . .

"Based on these diagnostic studies, Dr. Pembrook recommended that the plaintiff undergo double coronary bypass surgery. It was performed at St. Francis Hospital on April 10, 1981.

"Following surgery, the claimant experienced some improvement in her condition; but according to Dr. Pembrook's opinion, she was unable to work because of surgical complications when he examined her in July, 1981.

"He was of the further opinion that the bypass surgery did not eliminate the problem of coronary spasm, which still could be triggered by physical exercise or emotional stress.

"Dr. Pembrook was of the opinion that in persons suffering stenosing of the coronary arteries and spasm, that emotional stress raises the risk of myocardial infarction because of the additional demand placed upon the heart and its consequent need for oxygen provided by increased blood supply.

"Dr. Pembrook was of the further opinion that the events at the claimant's work place on the days immediately preceding June 17, 1980, were stressful to her and produced the symptoms of chest pains and angina. The stress was a factor that accelerated an underlying condition which had been asymptomatic and probably would have become acute at some time later.

"Dr. Robert Silverstein, a cardiologist of Hartford, Connecticut, examined the claimant's medical records, although he never personally examined her, and stated that it would have been helpful to do so in rendering his opinion about her condition and its causes.

"Like Dr. Pembrook, he was of the opinion that stenosing or hardening of the coronary arteries occurs over a long period of time, and that the claimant had an occlusion of 2 of these arteries. He also agreed with Dr. Pembrook that the claimant had not suffered a myocardial infarction, but that given her risk factors, the chances were greater than 'fifty/fifty' that she would.

"Of all of the conditions that create heart attacks, Dr. Silverstein placed stress at the lower end of the spectrum of contributing factors. It was his

The defendants' principal claim on appeal to the CRD was that the ultimate conclusion that the plaintiff's disability due to heart disease arose out of and in the course of employment was not supported by the findings when the appropriate standards of law are applied. The plaintiff's sole claim on her cross appeal was that the commissioner erred in failing to find that her disability continued after July 15, 1981.

The CRD affirmed and adopted the findings and award of the commissioner as corrected. The CRD noted that the employer claimed that the disability was

opinion that the plaintiff possessed other risk factors such as diabetes, high blood pressure, obesity, and a family history of heart disease that were far more significant in determining her condition.

"He was of the further opinion that stress played a different role in each individual and does not necessarily have a deleterious role as far as cardiovascular problems are concerned. In the case of the claimant, he did not feel that her job played a key role in her condition, and that stress can arise from situations other than on the job. He admitted that stress can cause an increased need for oxygen, can accelerate arteriosclerosis, and can be a precipitating factor in heart attacks.

"He was of the opinion that the claimant should be able to return to work 1 to 6 months post surgery.

"When questioned as to the necessity for coronary bypass surgery and its affects, Dr. Pembrook stated that the claimant's chances for prolonged life are no greater with the surgery than without. He stated that surgery might even accelerate occlusion that was already in the coronary arteries, that it is primarily for the relief of symptoms, is not curative, and is palliative. . . ."

The following additional findings were made by the commissioner in response to the defendants' motion to correct: "As of July 15, 1981, the claimant had never experienced a myocardial infarction. . . .

"In the fall and winter of 1980 and 1981, virtually any kind of physical activity resulted in chest pains and discomfort. . . .

"In the summer and fall of 1980, the claimant experienced severe chest pains when a friend died and when the claimant had a flu shot. . . .

"The vast majority of the factors underlying the claimant's coronary disease were personal as opposed to employment-related factors. . . ."

Although the preceding paragraph in the record has a notation of "D" indicating it was denied, we accept the accuracy of the commissioner's ruling on the respondent's motion to correct dated December 2, 1983, which indicates that that paragraph was granted.

caused by factors which preexisted the June, 1980 events, that the work place stress was only a minor factor, and that no injury or occupational disease as defined by statute had been proved. The CRD declined to substitute its factual conclusions for those of the commissioner.[2]

On their appeal from the order of the CRD, the defendants raise two issues: (1) whether the CRD applied the appropriate standard when analyzing heart disease cases for the necessary connection with employment; and (2) whether the appropriate standard was

---

[2] In its opinion the CRD stated: "[T]he remaining part of the respondent employer's evidentiary argument would have us adopt a type of major factor analysis as a basis for causation. That seemed to be the concept employed by the employer's counsel in the cross-examination of Dr. [Richard] Pembrook:

'Q. And you can't put any sort of percentage on the amount of job related stress that contributed to it, the problems, can you?' . . .

"But Connecticut has never adopted any major contributing factor theory. Instead we have relied on the substantial factor basis of proximate causation enunciated in *Mahoney* v. *Beatman,* 110 Conn. 184 [147 A. 762] (1929). Therefore, the fact that the claimant had pre-existent coronary atherosclerosis, as testified [to] by both Dr. Pembrook and Dr. H. Robert Silverstein, the Hartford Cardiologist testifying for respondent, does not in and of itself controvert the Commissioner's conclusion that the proximate cause of claimant's disability was work related. Neither does claimant's weight, her smoking or her family history of heart disease.

"Finally, Appellant argues, there was no one identifiable incident or unusual stress nor was there occupational disease found. We have discussed these issues recently in *Zipoli* v. *Watertown,* 215-CRD-5-83, (1/17/86), and before in *Gecewicz* v. *Sealtest Foods Division,* 77-CRD-1-81, 1 Conn. Workers Comp. Rev. Op. 195 (10/25/82). Our analysis in those cases demonstrates that neither a single identifiable incident nor unusual stress or exertion is required to conform to the statutory definition of injury.

"Claimant's cross appeal objects because the Commissioner failed to grant any benefits after July 15, 1981. That day was the date of Dr. Pembrook's deposition. Obviously, the Commissioner concluded he had insufficient medical basis for any findings concerning subsequent future benefits. If those benefits are now claimed, they must wait on further medical evidence.

"Both the employer's appeal and the employee's cross appeal are dismissed, and the Finding and Award of the Commissioner is affirmed as corrected."

met in this case. The plaintiff, in her cross appeal, claims error in the CRD's affirmation of the commissioner's conclusion that her total incapacity lasted from June 18, 1980, only until July 15, 1981, the date of "the last examination of Dr. Pembrook."

The defendants' first argument is that the plaintiff's disability was not caused by one of the three categories of injury defined in General Statutes § 31-275, which provides in subsection (8): " 'Personal injury', or 'injury', as the same is used in this chapter, shall be construed to include, in addition to accidental injury, which may be definitely located as to the time when and the place where the accident occurred, an injury to an employee which is causally connected with his employment and is the direct result of repetitive trauma or repetitive acts incident to such employment, and occupational disease as herein defined."

Subsection (11) of § 31-275 provides: " 'Occupational disease' includes any disease peculiar to the occupation in which the employee was engaged and due to cause in excess of the ordinary hazards of employment as such and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment."

"The act's definition of three categories of compensable personal injury is exclusive." *Grady* v. *St. Mary's Hospital,* 179 Conn. 662, 668, 427 A.2d 842 (1980). Since it is undisputed that the commissioner did not find that the plaintiff's heart disease was the result of repetitive trauma or occupational disease, the defendant's first claim is that the plaintiff can recover only if she proved that her disability was the result of an accidental injury definitely located as to time and place.

The defendants' second claim is lack of causation, since a compensable injury is one "arising out of and in the course of" employment. General Statutes

§ 31-284. As they argued before the CRD, the defendants claims that stress-related heart claims require a special test for causation.

The plaintiff frames the two issues of "accidental injury" and "causation" differently. She urges us to combine the two lines of thought into the single question of whether the CRD erred in determining, on the facts it affirmed and accepted as its own, that job-related stress was a substantial factor that proximately caused the plaintiff's cardiac disability described as myocardial ischemia, intermittent spasm, and angina pectoris. In discussing "causation," however, the plaintiff relies on Connecticut cases analyzing the issue in terms of accidental injury.

It is clear that the twin issues of "accidental injury" and "arising out of and in the course of employment" coalesce on occasion. Their interrelationship is extensively analyzed in A. Larson, The Law of Workmen's Compensation (1987) §§ 38.80 through 38.83. In most of the cases that Larson describes, the concepts of accident and causation are so commingled that it is impossible to segregate them. Id., § 38.82. Larson goes on to point out that in heart and related cases "the essence of the problem is causation." Id., § 38.83 (a).

General Statutes § 31-284[3] makes it very clear that, for our purposes, we are dealing with one overall standard. To qualify for compensation under the Workers' Compensation Act an employee must sustain a personal injury, arising out of and in the course of his employ-

---

[3] "General Statutes § 31-284 provides in relevant part: "An employer shall not be liable to any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, but an employer shall secure compensation for his employees as follows, except that compensation shall not be paid when the personal injury has been caused by the wilful and serious misconduct of the injured employee or by his intoxication."

ment. See General Statutes § 31-284 (a). Analysis of pertinent Connecticut authority reveals that our precedents bear out Larson's view that, in heart-related cases, the essence of the problem is causation.

We start with *Stier* v. *Derby,* 119 Conn. 44, 174 A. 332 (1934). The plaintiff's decedent, William Stier, was regularly employed at the Derby Gas and Electric Company and also was a supernumerary policeman for the city of Derby. He received a call from the Derby police informing him that a man had drowned in the Housatonic River and asking him to go there to render assistance. He rushed around to various places in great haste and excitement, obtained an inhalator, drove to the wrong location, and then to the correct one. When he reached the scene he grabbed the inhalator, suddenly lifted it out of the car and was running with it when he was told that one was already there. Twice during his hurried drive to the scene he experienced chest pain. When he returned to his car he was pale, sweating, and experiencing further chest pain. He was driven to his home, but before a doctor could be summoned he died. The commissioner found that his death was due to thrombosis or occlusion of the coronary arteries and that the excitement and unusual exertion were contributing causes of his death and constituted an accidental injury within the meaning of the compensation act. He further found that the decedent was employed only by the Derby Gas and Electric Company and that the injury arose out of and in the course of his employment. The defendant Derby Gas and Electric Company appealed to the Superior Court, which dismissed the appeal and confirmed the award. This court stated that the primary question on appeal was whether the decedent's death was the result of a personal injury received in the course of his employment and arising out of it. We held that the statute requiring proof of an accidental injury which can be definitely located both as to time

and place "does not require that the time be fixed by a stopwatch or the place by a mathematical point." *Stier* v. *Derby,* supra, 49–50. We determined that the time and place of the injury were definitely located as the interval of time and space covered by the deceased after his receipt of the information concerning the drowning until he left the scene of the drowning to return to Derby. Id., 50–51.

In sustaining the commissioner's finding, we held that "the coronary thrombosis or forming of the blood clot is a matter of a few minutes. Death from this source if caused by unusual excitement and over-exertion is an accidental injury within the compensation law. *Richardson* v. *New Haven,* 114 Conn. 389, 391, 158 A. 886 [1932]; *Hartz* v. *Hartford Faience Co.,* 90 Conn. 539, 543, 97 A. 1020 [1916]; *Monk* v. *Charcoal Iron Co.,* 264 Mich. 193, 224 N.W. 354, 355 [1929]; *Schroetke* v. *Jackson-Church Co.,* 193 Mich. 616, 160 N.W. 383, [1916]. 'Whatever predisposing physical condition may exist, if the employment is the immediate occasion of the injury, it arises out of the employment because it develops within it.' *Hartz* v. *Hartford Faience Co.,* supra, 539, 543; *Madden's Case,* 222 Mass. 487, 494, 111 N.E. 379 [1916]." Id., 52.

In *Jones* v. *Hamden,* 129 Conn. 532, 29 A.2d 772 (1942), the plaintiff's decedent was a public school janitor who was cleaning snow from a sidewalk. He was engaged in snow removal work for not more than two or three minutes when he fell unconscious. He died ten days later of a hemorrhage of an aneurysm in the brain.

The commissioner denied compensation concluding that the death was " 'not due to any accidental injury which may be definitely located as to the time when, and the place where it occurred, nor to any unusual activity incidental to his said employment on January 27th 1941, causing extraordinary excitement and

physical exertion.' " Id., 533. The commissioner further concluded that the death was not due to an accidental injury within the meaning of the Compensation Act, arising out of and in the course of the decedent's employment. Id. The Superior Court dismissed the plaintiff's appeal.

In reversing the trial court, this court stated that the "cause of death as shown by the autopsy was a hemorrhage of an aneurysm in the sub-arachnoid area of the brain. An aneurysm is an out-pouching of a blood vessel having its origin in a congenitally weak spot therein which eventually may get to a size and degree of weakness so as to rupture. It usually ruptures spontaneously although various factors such as high blood pressure, arteriosclerosis or strain may be contributory factors. Many complete ruptures are preceded by a slow leakage over a period of time. It is probable that Jones had suffered such a leakage for six months prior to his death." Id.

In our determination that the commissioner had failed to apply the correct rule of law in denying compensation, we relied on the definition of a compensable accidental injury previously articulated in *St. John* v. *U. Piccolo & Co.,* 128 Conn. 608, 611, 25 A.2d 54 (1942), that " 'it is generally held that an internal injury that is itself sudden, unusual and unexpected is none the less accidental, because it is incurred in the course of the employee's ordinary work; and that an injury incurred by a workman while performing his work in the normal, ordinary way may be an "accidental injury" and compensable.' " *Jones* v. *Hamden,* supra, 534.

Furthermore, we held that "[i]f the employment is the immediate occasion of the injury, the previous physical condition of the employee is immaterial. *Hartz* v. *Hartford Faience Co.,* [supra]; *Stier* v. *Derby,* [supra, 52]." Id., 535; see also *Garofola* v. *Yale & Towne Mfg. Co.,* 131 Conn. 572, 575, 41 A.2d 451 (1945).

Although the defendants in this case do not take issue with the compensability of heart attacks or myocardial infarctions resulting from strain and exertion, they argue that this case is different because there was no evidence of a distinct physical injury such as the death of a portion of the heart muscle. They also rely on *Donato* v. *Pantry Pride (Food Fair)*, 37 Conn. Sup. 836, 438 A.2d 1218 (1981), as illustrative of their position. In *Donato*, the plaintiff was a food store manager whose store showed a sizable cash shortage. While security investigators were still on the premises, the plaintiff collapsed. He was diagnosed as having suffered an acute myocardial infarction and cardiac arrest. The commissioner concluded that the plaintiff's infarction and cardiac arrest were caused by unusual job-related stress and exertion. In upholding the commissioner's finding, the court stated: "Much of the more recent litigation concerning the term 'injury' has involved various mental and nervous conditions 'which, as the tangible effects of mental states on physical functions are better understood, have come to play a large part in modern concepts of disability.' Larson, [supra, § 42.20]. With the exception of one decision to the contrary, decisions rendered in the past quarter century have uniformly awarded compensation where mental or nervous stress has caused distinct physical injury. Larson, loc. cit.; contra, *Toth* v. *Standard Oil Co.*, 160 Ohio St. 1, 113 N.E.2d 81 (1953)." Id., 839. *Donato* relied on *Stier* v. *Derby*, supra, for the proposition that death from coronary thrombosis, if caused by unusual excitement or overexertion, is a compensable accidental injury, overlooking the later cases which established that unusual excitement or overexertion is not required for compensability.[4]

---

[4] The Connecticut rule accords with the majority rule: "The 'by accident' requirement is now deemed satisfied in most jurisdictions either if the cause was of an accidental character or if the effect was the unexpected result of routine performance of the claimant's duties. Accordingly, if the strain

We conclude that the defendants' argument that there must be distinct damage to the heart before compensation may be awarded is hair-splitting. Such arcane distinctions of possible medical consequences of a stressful impact on the human cardiovascular system would necessarily introduce legalistic criteria into the field of medicine. We find a more realistic criterion to be that stated in *Bertrand* v. *Coal Operators Casualty*

of claimant's unusual exertions causes collapse from heart weakness, back weakness, hernia and the like, the injury is held accidental." A. Larson, The Law of Workmen's Compensation (1987) § 38.00.

Professor Larson explains that this rule also applies generally in "heart cases":

"§ 38.30 CATEGORY TWO: ROUTINE EXERTION CAUSING INJURY FROM 'GENERALIZED CONDITIONS.' . . . A substantial . . . majority of jurisdictions accept usual exertion as leading to accidental injury in this class of cases.

"§ 38.31 THE HEART CASES. The 'heart cases' dominate this category. In the decisions they appear under such laymen's designations as 'heart attack,' 'heart failure,' 'heart damage,' 'precipitation of heart disease,' or 'aggravation of heart condition,' and under such more specific or medical terms as coronary thrombosis, myocarditis, dilatation of heart, coronary sclerosis, coronary occlusion, angina pectoris, myocardial infarction, and fibrillation.

"The positions adopted in the various jurisdictions may be placed under three headings: acceptance of the usual-exertion rule in heart cases; rejection of the usual-exertion rule; and adoption of some other test for drawing the line between compensable and noncompensable heart attacks.

"§ 38.31 (a) JURISDICTIONS ACCEPTING THE USUAL-EXERTION RULE. The preponderance of jurisdictions that now accept the usual-exertion rule in heart cases is three to one over those that reject it.

"§ 38.31 (b) JURISDICTIONS REQUIRING UNUSUAL EXERTION. A substantial minority of jurisdictions—about a third, as just noted—require a showing of unusual exertion to relate a heart attack to the employment. The line between the two sets of holdings, however, is by no means perfectly precise. It is blurred on the side of the usual-exertion rule by cases in which courts suddenly seem to become worried about the almost limited range of heart cases they might be bringing within the Act and as a result produce an occasional restrictive decision difficult to reconcile with the main line of cases. The line is also blurred from the other side by the process of grasping at straws in some cases to find unusualness in which might look to the average man as the most commonplace effort in the course of a particular job.

"§ 38.31 (c). JURISDICTIONS WITH SPECIAL RULES. In the third category, that of jurisdictions using tests that cannot be described as mere accept-

*Co.,* 253 La. 1115, 1147–48, 221 So. 2d 816 (1968). In *Bertrand,* the plaintiff's heart began to beat erratically and he almost blacked out and fell while he was at work. The Supreme Court of Louisiana found that the claimant became disabled as a result of that episode and that the sudden change which took place in his physical condition at that time constituted an accident.

Apart from their contention that the plaintiff did not suffer a compensable "accidental injury," the defend-

ance or rejection of the usual-exertion rule . . . . [T]he present rule may be briefly summarized: A heart attack is compensable if attributable to unusual exertion under the older cases, or if attributable to an exertion placing upon the heart a strain greater than the wear and tear of ordinary life." A. Larson, The Law of Workmens' Compensation (1987) §§ 38.30 through 38.31 (c).

The defendants claim that *Donato* v. *Pantry Pride (Food Fair),* 37 Conn. Sup. 836, 438 A.2d 1218 (1981), requires a "distinct" physical injury and "ensuing heart attacks" to constitute an accidental injury. They attempt to distinguish this case by claiming that there was no distinct physical injury such as the death of a portion of the heart muscle as a result of a heart attack. The defendants cite *Kostamo* v. *Marquette Iron Mining Co.,* 405 Mich. 105, 274 N.W. 2d 411 (1979), as authority for the proposition that without definable injury to the heart, i.e., an infarction, there can be no recovery. A close examination of *Kostamo* reveals no such statement. The case is a fact-specific review of five heart stress cases reaching differing results depending on the specific factual matrix. Id., 147.

Similarly, *Landreneau* v. *Travelers Ins. Co.,* 345 So. 2d. 177 (La. App. 1977), which is cited by the defendants, made no such claim. It merely found a lack of work-related causation where the claimant's heart attack occurred at home. Finally, *Ayer* v. *Industrial Commission,* 23 Ariz. App. 163, 531 P.2d 208 (1975), merely states that under Arizona law "[a] disabling mental condition brought about by the gradual buildup of emotional stress over a period of time, and not by an unexpected injury causing event, is not compensable unless accompanied by physical force or exertion." Id., 166. To the contrary, the following cases allowed compensation without such a "distinct physical injury"; *Hoage* v. *Royal Indemnity Co.,* 90 F.2d 387 (D.C. Cir. 1937) (compensation to an overworked claims adjuster who suffered from angina pectoris); *Church* v. *Westchester County,* 253 App. Div. 859, 1 N.Y.S. 2d 581 (1938) (coronary occlusion found compensable); and *Kinney* v. *State Industrial Accident Commissioner,* 245 Or. 543, 423 P.2d 186 (1967) (preexisting aortic stenosis compensable without additional damage to the heart).

ants' principal argument is that we should adopt a new standard for deciding stress-related heart claims and abandon the long-standing rule that the claimant must prove that a sudden, unusual, and unexpected employment factor was a substantial factor in causing the claimant's condition. They propose that we adopt a rule propounded by Professor Larson in "The 'Heart Cases' in Workmen's Compensation: An Analysis and Suggested Solution," 65 Mich. L. Rev. 441 (1967). Larson proposes the balancing of employment factors versus nonemployment factors.

Relying principally on *Senzamici* v. *Waterbury Castings Co.,* 115 Conn. 446, 449, 161 A. 860 (1932), the defendants claim that prior Connecticut case law lays the foundation for such a test. In *Senzamici,* the plaintiff's decedent was employed in the defendant's foundry. He contacted influenza which later resulted in pneumonia from which he died. The commissioner held that the plaintiff did not show that the decedent's illnesses were causally connected with his employment and dismissed her claim for compensation. The Superior Court reversed the commissioner, finding such a causal connection. In reversing the trial court, this court stated: "[W]e said, in *Madore* v. *New Departure Mfg. Co.,* 104 Conn. 709, 713, 718, 134 Atl. 259 [1926]: 'The causal connection required to be established is, that the employment was the proximate cause of the injury, and this rule obtains whether the injury be the result of accident or disease. . . . Before he can make a valid award the trier must determine that there is a direct causal connection between the injury, whether it be the result of accident or disease, and the employment. The question he must answer is, was the employment a proximate cause of the disablement, or was the injured condition merely contemporaneous or coincident with the employment? If it was the latter there can be no award made. . . .' In the case of *Norton* v.

*Barton's Bias Narrow Fabric Co.,* 106 Conn. 360, 364, 365, 138 Atl. 139 [1927], we said: 'It is not sufficient that the conditions of the employment contributed to some undefined degree to bring on the disability from which the employee suffers. In the production of results many circumstances often play a part of so minor a character that the law cannot recognize them as causes. . . .' " Id., 448–49.

We do not agree with the defendants that *Senzamici* or the cases it cited stand in any way for a test based upon balancing nonemployment and employment factors to determine causation in a compensation case. These cases indicate that in Connecticut traditional concepts of proximate cause constitute the rule for determining such causation.

We decline to declare a new standard by judicial fiat. The defendants have advanced no persuasive reason why we should do so. We are aware of the enormous socioeconomic impact of such a change. The judicial engrafting of such a major change to our long accepted rule of causation in heart stress cases would not further either the cause of justice or the administration of the Workers' Compensation Act. Heart stress cases differ only in degree from other compensation cases involving causation in myriad differing fact patterns. Only the factual nuances and difficulties of expert medical testimony distinguish such cases. In order to recover, the claimant must prove causation by a reasonable medical probability. *Glenn* v. *Stop & Shop, Inc.,* 168 Conn. 413, 417, 362 A.2d 512 (1975); *Lyons* v. *Fox New England Theatres, Inc.,* 112 Conn. 691, 692, 153 A. 778 (1931).

Most significant is the lack of legislative action to change the long standing judicially developed standard of causation in compensation cases. As this court stated in *Ralston Purina Co.* v. *Board of Tax Review,* 203

Conn. 425, 525 A.2d 91 (1987): "[W]e presume that the legislature is aware of our interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation. *Herald Publishing Co.* v. *Bill,* [142 Conn. 53, 63, 111 A.2d 4 (1955)]; *Forman Schools, Inc.* v. *Litchfield,* 134 Conn. 1, 6, 54 A.2d 710 (1947); *Cashman* v. *McTernan School, Inc.,* 130 Conn. 401, 408, 34 A.2d 874 (1943); *Coombs* v. *Darling,* 116 Conn. 643, 646, 166 A. 70 (1933)." We conclude that the CRD did not err in the standard of compensability which it followed.

The defendants' second claim of error is essentially an attempt to get the CRD and this court to retry the facts. This we will not do. *Adzima* v. *UAC/Norden Division,* 177 Conn. 107, 117–18, 411 A.2d 924 (1979); *Balkus* v. *Terry Steam Turbine Co.,* 167 Conn. 170, 173–74, 355 A.2d 227 (1974); *Battey* v. *Osborne,* 96 Conn. 633, 634, 115 A. 83 (1921). The defendants' argument boils down to a claim that the commissioner should have accepted Dr. Robert Silverstein's opinion rather than Dr. Richard Pembrook's. The mere statement of this proposition refutes it. The commissioner's findings adequately support the conclusion that the plaintiff suffered an accidental injury definite as to time and place, from June 16 to June 18, 1980, while at work. This injury arose out of and in the course of her employment. The evidence supported the conclusion with a reasonable medical probability that the unexpected events at work were a substantial factor in precipitating the plaintiff's disabling disease. The CRD did not err in affirming the commissioner's findings and conclusions to this effect.[5]

---

[5] In the light of our conclusion as to the appropriate standard for determination of compensability, we need not decide if the events found by the commissioner to have occurred at the place of the plaintiff's employment between certain dates in June, 1980, constituted an unusual stress or exertion connected with the plaintiff's employment.

Concerning the plaintiff's cross appeal, the plaintiff conceded at oral argument that it was probably unnecessary. We simply agree with the CRD that the commissioner properly concluded that he had an insufficient medical basis for any findings concerning future medical benefits. The commissioner did not deny any such benefits. The plaintiff is free to pursue any such claims for benefits after July 15, 1981, as she sees fit.

There is no error on the appeal or the cross appeal.

In this opinion the other justices concurred.